**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

SUZANNE ALIPOURIAN-FRASCOGNA

Plaintiff,

vs.

ETIHAD AIRWAYS, and JOHN WRIGHT,

Defendants.

Case No.: 21-cv-0001

**COMPLAINT**

Plaintiff, SUZANNE ALIPOURIAN-FRASCOGNA, by and through her attorneys, Aaron B. Maduff of Maduff & Maduff, LLC, and Shari R. Rhode of Rhode Law Firm for her complaint against Defendants, alleges and states as follows:

**INTRODUCTION**

1.      Defendant, Etihad Airways, is the National Airline of the United Arab Emirates. Defendant has a policy of favoring people of Emirati National Origin and/or descent over others in its employment decisions and has been working via a specific plan to replace non-Emirati employees at higher levels with people of Emirati national origin and/or descent.

2.      Plaintiff, Suzanne Alipourian-Frascogna, an American citizen, has been a Senior Manager for Etihad Airport Operations in the Americas since 2013 and since Europe was added to her remit in 2017, Europe and the Americas.  In 2017 her supervisor informed her of a new policy that any APM (Airport Manager) roles which developed, needed to be filled by UAE Nationals/people of Emirati descent (Emiratis), and that the Board of the Airline had mandated that all APM roles had to be filled by Emiratis by 2022.  In 2018, the Plaintiff attended a Global Airports leadership meeting in Abu Dhabi. The then Manager, UAE Development (for Global Airports) presented (including a video outlining it) a plan to ensure

all Airport Manager roles are filled by UAE Nationals and/or people of Emirati descent (Emiratis). In February of 2019, the Airline issued a specific plan to advance Emiratis into higher positions, specifically identifying an Emirati to fill Ms. Alipourian-Frascogna's position. Feeling the increased pressure, she sought support from Defendant Wright. His response was that "you need to remember that all of us will be replaced by UAE Nationals." Comments like this continued throughout the year. She was also told repeatedly by Defendant Wright that her job life was limited because "we all will be replaced by Emiratis".

3.      Ms. Alipourian-Frascogna's counsel contacted Defendant Etihad's in-house counsel at the end of December of 2019 and communications continued into the early part of 2020. Defendant Etihad repeatedly represented that Plaintiff was a valued employee and that there was no reason to fear for her termination. However, further incidents which indicated movement to replace non-Emirati employees with Emirati employees and further comments by Defendant Wright caused Plaintiff continued concern and the dialogue continued between counsel with Defendant representing each time that Plaintiff was a valued employee, and her employment was not at risk.

4.      In addition to the threats, Plaintiff learned that an American Citizen of Emirati descent was being treated more favorably than Plaintiff with respect to tax equalization. This individual, though he was an American Citizen born in the United States, because he was of Emirati descent had dual U.S./UAE citizenship. Like all U.S. Citizens, he had the same tax obligations as Plaintiff here, though there is no income tax in the UAE for Emirati citizens. Despite policies to the contrary, the U.S. citizen of Emirati descent was advantaged through the tax equalization policy in that Defendant paid all his U.S. taxes whereas it did not do so for U.S. Citizens who were not of Emirati descent.

2

5.      Plaintiff filed her charge of discrimination on January 9 of 2020.  Defendant Etihad received that charge sometime thereafter, but most certainly before April 15, 2020. On information and belief, Defendant Wright was also aware and/or received that charge before April 15, 2020.

6.      In August of 2020, Defendant Etihad determined to reorganize a number of positions.  In so doing it worked hard to preserve employment of Emiratis to the detriment of others.  As part of that reorganization, it took the four Regional Manager positions (RM) and combined them into two positions.  The four individuals affected were Plaintiff, a person of Australian origin and descent, a person of Indian origin and descent, and an Emirati. Defendant Etihad through its agent, Defendant Wright, conducted interviews and Plaintiff applied for the positions.  The Australian individual decided not to apply at all, and the Eastern Hemisphere was given to the individual of  Indian origin and descent.  The Western Hemisphere, which included Plaintiff's prior Region (Europe and the Americas) was given to the Emirati though Plaintiff had more time, experience, and qualifications, and historically better performance.

7.      This Complaint for discrimination and retaliation followed.


**THE PARTIES**

8.      Plaintiff, Suzanne Alipourian-Frascogna, (hereinafter "Plaintiff" or "Suzanne") is an American citizen, born in Pine Bluff, Arkansas, and a resident of the State of Illinois.  At all relevant times Plaintiff resided and worked within the territorial jurisdiction of the United States District Court for the Northern District of Illinois. Plaintiff was the Regional Manager for Europe and the Americas.

9.      Defendant Etihad Airways (hereinafter "Defendant" or "Etihad" or "the Company") is, on information and belief, a public joint stock company established by Emiri decree, wholly owned by the Government of Abu Dhabi, licensed and doing business within the State of Illinois and the territorial jurisdiction of the United States District Court for the Northern District of Illinois.

10.     Defendant, John Wright (hereinafter "Wright"), is an individual who was Vice-President, Global Airport and Network Operations. Defendant Wright was at all relevant times, Plaintiff's supervisor, and Defendant Etihad's primary agent for discriminatory acts toward Plaintiff, including her termination and the determination to replace her with an Emirati.

## JURISDICTION AND VENUE

11.     Plaintiff filed a charge of discrimination complaining of harassment on the basis of her gender and national origin (a pattern of threats to her job) and of discriminatory tax treatment on January 9, 2020, Charge No. 440-2020-02265.

12.     On September 21, 2020, Plaintiff amended her charge (Charge No. 440-2020-02265) to include discriminatory and retaliatory termination.

13.     On December 9, 2020, the EEOC issued a notice of right to sue on Charge No. 440-2020-02655.

14.     This case is filed within 90 days of Plaintiff's receipt of the Notice of Right to Sue.

15.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as this matter involves federal questions based upon Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000-e, *et seq.* and 42 U.S.C. § 1981.

16.     Venue is proper in this District as Defendant is doing business in this District and a substantial part of the events giving rise to this cause of action arose in this District.

## FACTS

EMPLOYMENT HISTORY AND POSITION

17.     Plaintiff, Suzanne Alipourian-Frascogna (hereinafter "Plaintiff" or "Suzanne") was born in Pine Bluff, Arkansas, USA.  She is a citizen of the United States and of Persian heritage.

18.     Plaintiff was hired by Etihad on or about December 10, 2007 as a Lounge and Special Services Manager.

19.     Plaintiff was promoted on January 1, 2010 to a position with the title "Manager Premium Services."

20.     Plaintiff was again promoted in May of 2010, this time to a position with the title "Head of Hub Guest Services."

21.     Plaintiff was again promoted in 2011 to a position with the title "Head of Special Projects."

22.     On April 1, 2013, Plaintiff was promoted to Area Manager (AM) for North America.

23.     In 2016, Plaintiff was promoted to Regional Manager (RM) for the Americas.

24.     In or around November of 2017, Plaintiff was promoted to Regional Manager, Europe and the Americas.

25.     In this role, Plaintiff was responsible for Etihad's operations and Services at 23 Airports in the United States, Canada, South America, the United Kingdom, Europe, and Morocco.

26.     Plaintiff was based in Chicago but did considerable travel back and forth to her airports and to Abu Dhabi for work.

27.     Reporting directly to her were two Area Managers (who also served as Airport Managers (APM)) and eight other Airport Managers for the various airports in her region.

28.     The Area Manager for the Americas also served as the Airport Manager for Washington Dulles (IAD).

29.     This individual was an American Citizen, born in Ohio, who traveled on a U.S. Passport, and lived in the D.C. Metropolitan area.

30.     However, because he was of Emirati descent, he was also later awarded dual citizenship (U.S. and UAE).


The Harassment – Years of Threats to Plaintiff's Employment

31.     Suzanne first officially became aware of the decision to begin shifting higher level positions in the company to Emiratis in November of 2017.

32.     At that time, Defendant Etihad had determined that any newly opening APM roles were to be filled with Emiratis.

33.     Defendant Etihad's Board also mandated that by 2022, all APM roles should be filled by Emiratis.

34.     This policy shift was certainly uncomfortable at the time, but it became intolerable over the course of 2019.

35.     In February of that year, it became apparent that Etihad was reviewing Emiratis to the exclusion of non-Emiratis, for purposes of promotion to various senior positions.

36.     Defendant had also developed a promotional track for Emiratis, including one that brought the aforementioned Dulles Airport Manager (and Area Manager for the Americas), an Emirati, into Suzanne's role as Regional Manager for the Americas and Europe.

37.     In April of 2019, suffering continued anxiety over her position, Plaintiff approached her supervisor, Defendant Wright, and specifically asked whether there was a plan to replace her with her Emirati subordinate.

38.     Defendant Wright responded that there was none of which he was aware at that time, but "you need to remember that all of us will be replaced by UAE Nationals."

39.     Plaintiff informed Wright that she believed this to be discriminatory and in violation of U.S. law.

40.     Plaintiff also immediately made a complaint to her Human Resources Manager in New York.

41.     Defendant Wright responded by increasing the implicit threats to her employment.

42.     First, Defendant Wright attempted to place pressure on Suzanne by claiming that Etihad needed to have direct supervision in London – which meant that the Regional Manager for EU and Americas would have to relocate.

7

43.     Although Suzanne and her family live in the Chicago area, and her husband, also works for the Etihad on assignment in the U.S., Plaintiff was preparing to move to London to protect her job.

Etihad's and Wright's Insistence on an Emirati for the Position in London Which Would Eventually Fill Her Position.

44.     Realizing that she was prepared to move to London, Defendant Wright thereafter changed his mind and determined to create an Area Manager role at London Heathrow Airport (LHR).

45.     As this position was supposed to be reporting to Suzanne, she recommended the most qualified person for it who happened to be a U.K. National of Anglican descent.

46.     On July 22, 2019, Defendant Wright conducted a mandatory mid-year performance review with Suzanne.

47.     During the review, he stated to Suzanne "I'm still on the hook with our COO to put someone in London.  Now that you are not moving, we need to put someone in the AM position in London.  I am keen on hearing your views on this.  I've had some feedback that you allegedly said that [the U.K. National] would be a good candidate".

48.     But Defendant Wright rejected this individual because the position needed to be filled by an Emirati.

49.     Indeed, his specific words were "But I have been quite clear with you that he [this individual] holds the wrong passport for the role, it must be filled by a UAE National."

50.     Over the ensuing months, the new Area Manager position still appeared to be a threat to Suzanne's job.

51.     In early December of 2019, the on-going had reached a point where Plaintiff felt the need to bring her concerns of discrimination and retaliation to Eithad's COO directly and did so.

52.     In December 2019, the job description which she had prepared for the area manager position was changed to include the words "lead, plan, and direct the defined *region*." (Emphasis added.)

53.     Directing the region is of course the definition of the Regional Manager's – Suzanne's -- role.

54.     Meanwhile, the Dulles Area Manager had been called to the UAE for military service.

55.     This created a potential vacancy at Dulles.

56.     Despite the threat the London Heathrow Area Manager position had to her own employment, in an effort to continue to do her job as ordered, on December 11, 2019, Plaintiff began the process of posting the position.

57.     She was stopped by Defendant Wright who informed her that "if [the Dulles APM] is not going into military service, which I understand we will know shortly, then this advert is unlikely to go ahead.  i.e., We will be requesting that he moves to where the business need exists."

58.     For his part, the Dulles APM was informed that the LHR position would define his career and that he had to take it because the next step which is the RM [Regional Manager for Europe and the Americas – i.e., Suzanne's)] "is coming sooner than [he thinks.]"

59.     Plaintiff made a formal complaint of discrimination and harassment to Human Resources.

60.     Meanwhile, with the expectation that the Dulles APM would be leaving his post at IAD for military service (or to take the position as AM at London Heathrow), the search for a replacement began.

<u>Defendants Insist that the Americas Area Manager/Dulles Airport Manager Role Be Filled By an Emirati In Order to Keep an Emirati in Line for Suzanne's Regional Manager Position</u>

61.     Plaintiff told Defendant Wright that the Dulles APM position would need to be posted internally to give people a chance to apply on an equal basis.

62.     Instead, Defendant Wright specifically stated that he would like a UAE National to fill the role and asked about moving the Los Angeles International Airport (LAX) manager, (also an Emirati) into the position.

63.     Plaintiff stated concerns about pressure on that individual to move but said that she would post the position and the interim manager, an American who was not of Emirati descent, could cover until the position was filled.  (Indeed, this person had served as the interim manager before the American of Emirati descent had been moved into the position, so he was eminently qualified.)

64.     Defendant Wright insisted that Dulles was a high-profile station and that he wanted a UAE National in the position.

65.     This not only reignited Suzanne's anxiety, but also put her in the position of potentially participating in discriminatory activity to which she objected.

66.     As a result, she made another formal complaint to Human Resources of discrimination.

Etihad Responds By Turning Its Attention Back to London

67.     Thereafter, Etihad determined not to transfer the Dulles APM to London in preparation for moving him into Suzanne's position.

68.     However, Defendant Wright continued to insist that the Area Manager position in London be filled.

69.     It was now Plaintiff's job along with a recruiter to interview and hire the most qualified person.

70.     That person was the British National of Anglican descent.

71.     However, Defendant Wright suddenly insisted that one of Plaintiff's peers outside the reporting structure participate in the interviews.

72.     In addition, Defendant Wright also insisted that the initial recruiter scheduled to conduct the interview with Suzanne be removed and his supervisor conduct the interview with Suzanne instead.

73.     On information and belief, Defendant Wright inserted these individuals into the process to ensure that Plaintiff not hire a non-Emirati for the role.

74.     The British National of Anglican descent did apply and did interview with Plaintiff and the other individual.

75.     The British National of Anglican descent was clearly the best choice – and at that point the only applicant.

76.     Suzanne determined to hire him for the position, but her co-interviewer refused to support that decision.

77.     Again, fearful that she was being required to be complicit in race and national origin discrimination, she objected, and they agreed to simply let Defendant Wright interview the individual and make the decision.

78.     On information and belief, in October of 2020, the British National was again interviewed and was told that his application for the position was unsuccessful.

Defendant Wright Further Increases the Level of Harassment Directed At Plaintiff

79.     During the course of 2020, Defendant Wright put further pressure on Suzanne that has not been placed on people who have not complained of discrimination.

80.     This increased pressure included but was not limited to making higher demands upon her for travel approval, and suggestions that she was having performance issues – this in spite of the contrary assertions made by Etihad's in-house and external counsel that Suzanne was a top performer and highly valued.

81.     The criticisms at issue were untrue and were made with the intent of punishing Plaintiff for having made complaints and to prepare her for termination because of her race and national origin.

82.     Plaintiff therefore made another complaint of discrimination and harassment to Defendant Wright for his continued actions.

Plaintiff is Terminated Because Emiratis Are Favored In a Reduction In Force and/or In Retaliation for Her Complaints of Discrimination

83.     On information and belief because of the effects that Covid-19 has had on the travel industry, Etihad determined to reduce its head count and reorganize.

84. On information and belief, there was a directive from Etihad's Board of Directors that during this reduction, every effort was to be made to retain Emiratis.

85. On August 6, 2020, Defendant Wright informed Plaintiff that there would be a reorganization in Etihad's structure.

86. Where before the airline had divided the world into four regions with four regional managers, it would now combine those into two regions.

87. The East/South Asian region and the Australian region would be combined into one region covering the Eastern Hemisphere and the Middle East region and Europe and Americas Region would be combined into one region in the Western Hemisphere.

88. Etihad asked all four regional managers (an Australian National who had the Australian region, an Indian National who had the East Asian region, an Emirati National who had the Middle East region, and Suzanne who had Europe and the Americas ) to apply.

89. Suzanne was the only one of these individuals who had made complaints of discrimination.

90. The Western Hemisphere Region which encompassed Plaintiff's prior Region was given to an Emirati.

91. The Australian RM decided not to apply at all.

92. Defendant was well aware that there were no Emiratis available to fill positions in Australia and therefore, there was no need to place a barrier in this individual's path to applying for an AM role.

93. He was therefore retained, and on August 19, 2020, he was asked to remain working until an Area Manager role became available so that he could (and did) apply for it.

94. The Australian former RM was successful in his application for the AM role.

95.     By contrast Plaintiff was dismissed immediately.

96.     Had Plaintiff been retained until November of 2020, she would have had an opportunity to apply for the Americas Area Manager position as the incumbent's International Assignment expired in November 2020.

97.     However, because she was terminated immediately, she was not permitted to compete for the position with the Emirati chosen to fill it.

98.     This was consistent with the directive to preserve employment of individuals of Emirati descent over those who were not of Emirati descent.

<u>Differential Tax Treatment Is Applied to Favor Emirati Americans over Non-Emirati Americans</u>

99.     Etihad has a "Global Tax Equalization Policy."

100.    The purpose of this policy is to ensure that when an employee is placed outside his home country by the company, he does not have a different tax obligation than he would have were he placed in his own country.

101.    For U.S. citizens or resident aliens, the rules for filing income, estate, and gift tax returns and paying estimated tax are generally the same whether said individual is in the United States or abroad; worldwide income is subject to U.S. income tax, regardless of where a U.S. Citizen resides.

102.    The policy's stated objective is to ensure that differences in income tax and social security costs relating to the company income resulting from temporary international assignment does not result in an advantage or disadvantage to any employee.

103.    Where the employee has permanent residency status or naturalized citizenship in the host country, however, his tax equalization is to be localized.

104.    The United Arab Emirates (UAE) does not have an income tax.

105.    Etihad's Equalization Policy  provides that employees holding an employment contract in Abu Dhabi are not liable for personal income taxation on employment income as per the current laws and regulations of the United Arab Emirates (UAE).

106.    For these individuals, while on international assignment, the UAE will be considered as the taxation point of reference and consequently the taxation on company income, including benefits in kind, will be nil. Tax liabilities in third countries (for example US citizens or US green card holders who are still tax liable in a third country) will not be covered under this policy and taxes remain the full responsibility of the assignee.

107.    Both Suzanne, and the Emirati individual who had been serving as the Americas Area Manager/Dulles Airport Manager are U.S. Citizens: Suzanne born in Pine Bluff, Arkansas, and the individual of Emirati descent born in Ohio.

108.    Both are therefore generally subject to U.S. Tax obligations no matter where in the world they work.

109.    Etihad's stated tax policy excludes coverage for U.S. citizens such that U.S. taxes for U.S. Citizens remain the full responsibility of the employee.

110.    Consistent therewith, Etihad has never covered Suzanne under this policy.

111.    However, the U.S. Citizen of Emirati descent is working in the U.S., but Etihad nevertheless covers him under the policy:  Etihad pays his U.S. taxes, and he pays no taxes in the UAE.

112.    This is inconsistent with the stated purpose of the tax equalization policy.

113.    Furthermore, it is discriminatory to the detriment of Americans who are not of Emirati descent.

114.     Indeed, Etihad staff members who have been sent to the U.S. on International Assignments who are not of Emirati descent and/or national origin have been forced to move to local U.S. contracts as soon as they have obtained a green card or permanent residence in the United States.

115.     Once this happens, Etihad no longer pays the U.S. tax liabilities, unless the individual is of Emirati Descent.

116.     For example, another Emirati who holds U.S. citizenship and who was in the U.S. from approximately 2012 to 2014 had apparently not paid his U.S. taxes in years.

117.     Etihad covered all of his outstanding taxes (in excess of $200,000) and continued to pay his U.S. tax liabilities while stationed in the United States, his home country.

118.     Etihad therefore has a practice of paying U.S. taxes for U.S. citizens and residents of Emirati descent and/or national origin, but not for U.S. citizens who are not of Emirati descent.


**COUNT I**

**DEMAND FOR RELIEF**
**FOR HARASSMENT ON THE BASIS OF RACE AND NATIONAL ORIGIN**
**IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**42 U.S.C. §2000E *ET SEQ.*, AND**
**42 U.S.C. §1981**

119.     Plaintiff restates and realleges paragraphs 1 through 118 as paragraph 119 of this Count I.

120.     By virtue of the foregoing, Defendants have engaged in a consistent pattern and practice of placing Plaintiff in considerable stress and anxiety from 2017 through her termination, in August of 2020.

121.    On information and belief, the latter portion of that pattern was aimed at achieving Plaintiff's constructive discharge.

122.    By virtue of the foregoing, Defendants engaged in this pattern because they were seeking to discriminate against Plaintiff on the basis of her race and national origin, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.,* as well as 42 U.S.C. §1981.

123.    As a result of this violation, Plaintiff has suffered damages.

124.    Defendants' actions in this regard, particularly in that they had the goal of achieving a constructive discharge, were willful and malicious and/or in reckless disregard of her federal rights to be free from discrimination warranting the imposition of punitive damages.

WHEREFORE, Plaintiff, Suzanne Alipourian-Frascogna, respectfully requests that this Honorable Court enter judgment in her favor against Defendants Etihad Airways and John Wright, jointly and severally for compensatory and punitive damages, for attorneys' fees and costs, and for such other and further relief this Court deems just and equitable.

## COUNT II

### DEMAND FOR RELIEF
### FOR RETALIATORY HARASSMENT IN VIOLATION OF
### TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### 42 U.S.C. §2000E *ET SEQ.,* AND
### 42 U.S.C. §1981

125.    Plaintiff restates and realleges paragraphs 1 through 118 as paragraph 125 of this Count II.

126.     By virtue of the foregoing, Defendants have engaged in a consistent pattern and practice of placing Plaintiff in considerable stress and anxiety from 2017 through her termination, in August of 2020.

127.     On information and belief, the latter portion of that pattern was aimed at achieving a constructive discharge.

128.     By virtue of the foregoing, Defendants engaged in part of this pattern because they were seeking to retaliate against Plaintiff for having complained of discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.,* as well as 42 U.S.C. §1981.

129.     As a result of this violation, Plaintiff has suffered damages.

130.     Defendants' actions in this regard, particularly in that they had the goal of achieving a constructive discharge, were willful and malicious and/or in reckless disregard of her federal rights to be free from retaliation warranting the imposition of punitive damages.

WHEREFORE, Plaintiff, Suzanne Alipourian-Frascogna, respectfully requests that this Honorable Court enter judgment in her favor against Defendants Etihad Airways and John Wright jointly and severally for compensatory and punitive damages, for attorney's fees and costs, and for such other and further relief this Court deems just and equitable.

## COUNT III

## DEMAND FOR RELIEF
## FOR DISCRIMINATORY AND/OR RETALIATORY TERMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
## 42 U.S.C. §2000E *ET SEQ.* AND
## 42 U.S.C. §1981

131.     Plaintiff restates and realleges paragraphs 1 through 118 as paragraph 131 of this Count III.

132.     By virtue of the foregoing, Defendants have selected Plaintiff for termination on the basis of her race and national origin and/or in retaliation for her prior complaints of national origin discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.* as well as 42 U. S. C. §1981.

133.     As a result of this violation, Plaintiff has suffered damages of both a pecuniary and non-pecuniary nature.

134.     Defendants' actions in this regard, particularly in light of the fact that they had worked hard to terminate her earlier and Defendant Etihad Airways had already been served with a charge of discrimination for harassing her with the threat of termination were willful and malicious and/or in reckless disregard of her federal rights to be free from discrimination and retaliation warranting the imposition of punitive damages.

WHEREFORE, Plaintiff, Suzanne Alipourian-Frascogna, respectfully requests that this Honorable Court enter judgment in her favor against Defendant Etihad Airways and John Wright jointly and severally for lost wages including backpay and front-pay, for compensatory and punitive damages, for attorney's fees and costs, and for such other and further relief this Court deems just and equitable.

**COUNT IV**

**DEMAND FOR RELIEF**
**FOR DISCRIMINATORY TAX TREATMENT  IN VIOLATION OF**
**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**42 U.S.C. §2000E *ET SEQ.,* AND**
**42 U.S.C. §1981**
**AGAINST DEFENDANT ETIHAD AIRWAYS**

135.     Plaintiff restates and realleges paragraphs 1 through 118 as paragraph 135 of this Count IV.

136.     By virtue of the foregoing, Defendant has paid hundreds of thousands of dollars to U.S. Citizens of Emirati descent to cover their U.S. tax liabilities that it does not pay to U.S. Citizens who are not of Emirati descent, and specifically Plaintiff, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.* as well as 42 U. S.C. §1981.

137.     As a result of this violation, Plaintiff has suffered damages of both a pecuniary and non-pecuniary nature.

138.     Defendant's actions in this regard, particularly in light of the fact that it has engaged in this discriminatory treatment not just of Plaintiff, but of all U.S. Citizens who are not of Emirati descent is willful and malicious and/or in reckless disregard of her federal rights to be free from discrimination warranting the imposition of punitive and exemplary damages.

WHEREFORE, Plaintiff, Suzanne Alipourian-Frascogna, respectfully requests that this Honorable Court enter judgment in her favor and against Defendant Etihad Airways for lost wages including backpay and front-pay, for compensatory and punitive and exemplary damages, for attorney's fees and costs, and for such other and further relief this Court deems just and equitable.

**PLAINTIFF DEMANDS A TRIAL BY JURY AS TO ALL ISSUES SO TRIABLE**

Respectfully Submitted,

By:/s/ Aaron B. Maduff

Aaron B. Maduff
Attorney No. 6226932
Maduff & Maduff, LLC
Phone: 312-276-9000
abmaduff@madufflaw.com

Shari R. Rhode
Attorney No. 2324598
Rhode Law Firm
618/549-4287
shari@rhodelawfirm.com