**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SUZANNE ALIPOURIAN-FRASCOGNA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 21 C 0001** |
| | ) | |
| **ETIHAD AIRWAYS, SPJC,** | ) | **Magistrate Judge Sheila Finnegan** |
| | ) | |
| **Defendant.** | ) | |

**ORDER**

Plaintiff Suzanne Alipourian-Frascogna brings claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000E, *et seq.*, and 42 U.S.C. § 1981, for harassment on the basis of race and national origin, retaliatory harassment, retaliatory and discriminatory termination, and for discriminatory tax treatment in connection with her employment with Defendant Etihad Airways, SPJC. (Doc. 1 ¶¶ 119-138). She claims that Defendant, the national airline of the United Arab Emirates, violated these statutes when it made employment decisions based on race and national origin by favoring individuals of Emirati origin or descent. (E.g., Doc. ¶¶ 1-2).

The parties agree that discovery is complete except to the extent the Court orders further discovery based on the resolution of issues raised in Plaintiff's Motion to Compel Discovery (Doc. 57), Defendant's Motion to Compel (Doc. 67), and Plaintiff's Motion for Leave to File a Surreply in Opposition to Defendant's Motion to Compel (Doc. 79). As discussed herein, Plaintiff's motion to compel is denied, Defendant's motion to compel is

granted in part and denied in part, and Plaintiff's motion for leave to file a surreply is denied.

## I.    DEFENDANT'S MOTION TO COMPEL (Doc. 67)

### A.    Background

On April 28, 2023—more than two years after this case was filed and near the close of discovery—Plaintiff made a supplemental production of four (4) audio recordings between Plaintiff and other Etihad employees (the "Audio Files" or "recordings"). (Doc. 67-5, at 2). Plaintiff had never before even mentioned the existence of such recordings. The recordings were not produced in their native format, and thus metadata relating to their creation was not contained in Plaintiff's production. (Doc. 67, at 4). Two of the employees whose conversations were recorded were John Wright (Plaintiff's former supervisor) and Scott Nielson (Etihad's head of International Human Resources). Neither made or consented to the recordings. (Doc. 67-1, at 1-2; 67-2, at 2-3).

On May 1, 2023, Defendant sent a letter to Plaintiff seeking discovery into the Audio Files, including the identity of the person making each recording; where the recording was made; the date of the recording; when Plaintiff came into possession of the recording; whether Plaintiff claimed the recording was made with full consent of all parties; and why the recording was not produced until April 28, 2023. (Doc. 67-3, at 2-3). Defendant also sought to depose Plaintiff regarding the Audio Tapes. (*Id.* at 3).

On May 4, 2023, Plaintiff's counsel responded to this letter by explaining that since unauthorized recording may trigger criminal liability under Illinois law, "at this time, my client declines to respond on the grounds that her answers might serve to incriminate her in violation of her rights under the Fifth Amendment to the United States Constitution."

(Doc. 67-9, at 2).[1]  He did, however, explain that the reason the recordings had not been previously produced is that Plaintiff's review of past depositions in the case "sparked a memory for her that she might have access to certain material found in places that it never occurred to her to look."  After looking, she "found these recordings."  (*Id*.).  Plaintiff's counsel refused the request for a renewed deposition of Plaintiff since the "subject matter of the recordings" had already been thoroughly explored at her deposition and "[a]nything about the recordings themselves would trigger the same objections provided herein," i.e., the Fifth Amendment objection.  (*Id*. at 3).

Defendant also served ten requests for admission and ten interrogatories relating to the recordings.  (Doc. 67-4, at 2-7 (RFAs); Doc. 67-4, at 9-15 (Interrogatories)).  The RFAs sought Plaintiff's admission that she recorded the conversations and did so without the consent of all parties to the conversations, that she recorded other conversations, and that she deleted other recordings.  The interrogatories repeat some of the questions in defense counsel's letter described above, but also seek to learn (among other things) whether Plaintiff used the recordings in this case (such as to draft the EEOC charge or complaint or to prepare for depositions or respond to discovery); when counsel learned of the recordings and why they were not produced earlier; the identity of the devices and software on which the recordings were made; the names of all those with whom Plaintiff shared the recordings; whether she recorded other conversations; what recordings she deleted; and why she made the recordings.  In a conference between counsel on May 11,

---

[1]      It should be noted that Illinois law also criminalizes the use or disclosure of "information which [a person] knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article."  720 ILCS 5/14-1(a)(5).

2023, Plaintiff's counsel stated that Plaintiff would assert the Fifth Amendment "in response to most, if not all, of these requests." (Doc. 67, at 5-6).

In this motion, Defendant seeks an order compelling Plaintiff to:

(1) respond to the Supplemental Discovery Requests on an expedited basis; (2) submit any and all personal device(s) on which she recorded and/or stored the Audio Files for a forensic examination to investigate facts relating to the Audio Files, and whether additional recordings exist, or have existed and since been deleted; (3) immediately produce the Audio Files in their native format(s) with all associated metadata; and (4) confirm once and for all that Plaintiff has produced all relevant documents (including audio and video files) in her possession, custody, or control.

(Doc. 67, at 6).

### B.    Analysis of Motion 67

#### 1.    Relevance of Discovery into Recordings and Circumstances Surrounding Their Making

Neither party disputes that the Audio Tapes are potentially relevant (although Defendant has not conceded that they are genuine and reserves its right to challenge their admissibility, Doc. 78, at 10). For example, Plaintiff contends that one recording reflects that her supervisor, John Wright, perjured himself in his deposition in this case, while Defendant contends the supervisor's testimony is consistent with the recording. (*Compare* Doc. 69, at 1-2 *with* Doc. 78 at 2-5). As another example, Plaintiff tried to use a transcript to supplement her grounds for taking additional depositions (see Doc. 71, and Section II.A below). For these reasons alone, discovery into the evidentiary foundation and the making of the produced (and potentially other) recordings and transcripts must proceed to allow the district judge to determine their admissibility.

The discovery may also be relevant to other issues, such as the potential destruction of or failure to preserve evidence by Plaintiff. For example, an August 22,

2020 email that Plaintiff wrote to Defendant purports to contain detailed quotations from a conversation between Plaintiff and supervisor Wright on August 13, 2020 about whether she would move to the UAE to qualify for a new position with the company. No recording or transcript of this call has been produced by Plaintiff. (Doc. 78-1, at 56; Doc. 78, at 14). These facts could suggest that a recording of this call existed at the time of this email— which is well after Plaintiff retained counsel in this case, see Doc. 78-1, at 51-52—but may no longer exist. While Plaintiff says (through unsworn statements in a brief) that she is not aware of the existence of other recordings and thus need not answer questions on this topic (Doc. 69, at 10), Defendant is entitled to obtain sworn discovery responses from Plaintiff on questions about whether other recordings were made and what happened to them.

Relatedly, Defendant is entitled to explore how the Plaintiff plausibly could have obtained, and then forgotten about, these recordings, producing them only after most of the discovery in the case was done and when the disclosure appeared to benefit her. This testimony may bear not only on Plaintiff's credibility but whether other recordings may have been created and may still exist. For this reason, Plaintiff is wrong in arguing that her motive in potentially taping (or being involved in the taping of) phone calls and in using the recordings is irrelevant. (Doc. 69, at 9, 10). If she engaged or participated in taping phone calls in order to use the information to negotiate with or sue Defendant or to assist her in the litigation, that conduct would undercut her claim to have forgotten all about them until late April 2023.[2] This in turn may bear not only on her credibility, but whether she fulfilled her discovery obligations in the case.

_____

[2] Defendant points out, for example, that Plaintiff inserted long quotations into an August 22, 2020 email to Defendant (Doc. 78-1, at 54-60) going over the history of her employment. Quotations from calls

This discovery of the circumstances surrounding the recordings is also relevant to whether Plaintiff may properly assert the Fifth Amendment in the first place. Since the prospect of criminal liability associated with the recordings may depend on where and when the recordings were made, discovery into these issues could be important. If her taping was made in a jurisdiction that allowed such activity, as one example, that would be relevant to whether she can invoke the Fifth Amendment at all. The discovery Defendant has propounded is relevant and permissible for all of these reasons.

### 2. Plaintiff's Obligation to Answer Individual Questions

The fact that Plaintiff (through counsel) has declared her intent to assert the Fifth Amendment right against self-incrimination in response to "most, if not all" of Defendant's requests (Doc. 67, at 5-6) about the Audio Tapes does not mean that Plaintiff need not answer individual deposition questions and written discovery requests. Plaintiff claims that requiring her to answer would violate her constitutional rights (Doc. 69, at 7), but that is incorrect because Plaintiff may invoke the privilege in response to individual discovery questions and requests if she has a good faith basis to do so. Indeed, the case law is clear that a party seeking to invoke this privilege cannot do so on a blanket basis but "must make a determination with regard to each specific question posed to him whether the question creates some tendency to subject him to criminal liability." *Zuniga v. Morris Material Handling, Inc.*, 2011 WL 663136, at *6 (N.D. Ill. Feb. 14, 2011) (Fifth Amendment does not give witness "carte blanche" to "refuse to answer all questions"). See also *Trustees of Chicago Regl. Council of Carpenters Pension Fund v. Drive Constr., Inc.*, 2022 WL 16635553, at *3 (N.D. Ill. Nov. 2, 2022) ("whether the privilege may be invoked

---

made on August 17 and 19, 2020 track recordings she produced, strongly suggesting that Plaintiff used the recordings to draft the email. (Doc. 78, at 13-14).

must be determined on a question-by-question-basis").   Plaintiff cannot avoid discovery on important issues in the case by making a blanket assertion of the Fifth Amendment through counsel's argument in her responsive brief (see Doc. 69, at 11-13).

When under oath at a deposition, or in verified responses to interrogatories or in answers to requests to admit, Plaintiff may either respond substantively to a question or assert the Fifth Amendment and subject herself to a potential adverse inference from that response.   See generally *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 663 (7th Cir. 2002) ("general rule is that an adverse inference may be drawn from" assertion of the Fifth Amendment "in a civil case").  The precise wording of each question, and Plaintiff's response, provide critical information enabling a court to assess whether the privilege has been properly asserted; whether the privilege has been waived; and what adverse inference (if any) may be drawn from the invocation of the privilege.[3]

Plaintiff also complains about the possibility that answering questions might result in her waiver of the Fifth Amendment privilege.  (Doc. 69, at 5-6, 12).  But Plaintiff does not cite a single case holding that the risk of waiver would allow her to rely on a blanket assertion of the privilege.   Rather, it is up to Plaintiff and her counsel to determine in relation to specific questions posed to her  whether there is a good faith basis to assert this privilege.

Accordingly, Plaintiff shall sit for a four-hour deposition limited to the issues raised by the production of the Audio Tapes, including all of the issues discussed in this Order. Plaintiff shall also respond to Defendant's RFAs and Interrogatories on these issues.

---

[3]     Plaintiff's argument that an adverse inference need not be drawn from assertions of the Fifth Amendment (Doc. 69, at 6-7), is premature.  Neither side has asked the Court to rule on such issues in the instant motion.  Ultimately, the district judge must decide these issues after a full record has been made.

### 3.    Waiver of Fifth Amendment Privilege

Defendant argues that Plaintiff cannot assert the Fifth Amendment privilege because she waived it when she produced the Audio Tapes. (Doc. 67, at 8). The Fifth Amendment can be invoked to protect against production of incriminating documents where production constitutes an incriminating testimonial communication. *Fisher v. U.S.*, 425 U.S. 391, 407 (1976). In such a case, "the **act** of producing documents may be testimonial and incriminating," for example, by "conced[ing] the existence (or nonexistence)" of documents or "their possession or control by the witness." *In re Special Feb. 2011-1 Grand Jury Subpoena Dated Sept. 12, 2011*, 691 F.3d 903, 906 (7th Cir. 2012) (emphasis original). "[O]nce a witness has freely testified to incriminating facts, he cannot refuse to testify as to the details." *In re Stoecker*, 103 B.R. 182, 187 (Bankr. N.D. Ill. 1989). Defendant claims here that because Plaintiff "has already testified as to the existence of the Audio Files," presumably by producing the files, any Fifth Amendment privilege she had with respect to those files is now waived. (Doc. 67, at 8).

Here, the recordings were produced via email by Plaintiff's counsel's assistant. (Doc. 67-5, at 2). In an accompanying letter, Plaintiff's counsel explained what his client would say about her belated discovery of the tapes, namely, that Plaintiff's review of past depositions in the case "sparked a memory for her that she might have access to certain material found in places that it never occurred to her to look" and that after looking, she "found these recordings." (Doc. 69-9, at 2). In this recitation of events, there is no statement that Plaintiff recorded the calls; arranged for the calls to be recorded by others; or knew the calls were being recorded. (See Doc. 69, at 5 (where Plaintiff argues

"possession of the recordings does not in any way show that Plaintiff made the recording")).

Defendant argues that Plaintiff must have known about or participated in these unlawful recordings so her mere possession of them was incriminating, and thus the act of production waived the privilege. (Doc. 78, at 6). While it certainly is true that Plaintiff knew of the recordings at some point in time, the Court has no basis to find on the present record that Plaintiff necessarily participated in making the recordings and did so in a jurisdiction where her conduct arguably would be unlawful. Hence, the Court is not prepared on the present record to find that Plaintiff's production of the recordings, without more, waived her Fifth Amendment privilege.

### 4. Production of Native Formats

Defendant asks that the Audio Tapes be produced again but this time in native format and showing all associated metadata. (Doc. 67, at 2). Such information is relevant to the evidentiary foundation for the recordings (including their dates). Plaintiff did not respond to this request. (See Doc. 69). The motion is granted as to this request.

### 5. Forensic Examination of Devices on which Recordings were Made

Defendant argues that "[i]n order to investigate the creation, storage, transfer, and/or deletion of any of the Audio Files and/or other, yet-unproduced recordings of telephone conversation with Etihad employees", it should be permitted to conduct a forensic examination "on any of Plaintiff's personal devices on which she recorded and/or stored such audio recordings." (Doc. 67, at 11-12). The threshold issue to be addressed is whether a forensic exam is justified here.

A forensic ESI exam is an extraordinary remedy that is required "[o]nly if the moving party can actually prove that the responding party has concealed information *or* lacks the expertise necessary to search and retrieve all relevant data." *Mirbeau of Geneva Lake LLC v. City of Lake Geneva*, 2009 WL 3347101, at *1 (E.D. Wis. Oct. 15, 2009). "Mere suspicion or speculation that an opposing party may be withholding discoverable information is insufficient to support an intrusive examination of the opposing party's electronic devices or information system." *Hespe v. City of Chicago*, 2016 WL 7240754, at *4 (N.D. Ill. Dec. 15, 2016) (internal quotes and citation omitted). In determining whether a third-party exam is required, courts must guard against undue intrusiveness and protect the non-moving party's privacy interests. *See John B. v. Goetz*, 531 F.3d 448, 459-60 (6th Cir. 2008). To that end, courts must take care to ensure that the request for a forensic exam is proportional to the needs of the case. *See Motorola Solutions, Inc. v. Hytera Comm. Corp.*, 365 F.Supp.3d 916, 925 (N.D. Ill. 2019).

Defendant argues that a forensic exam is appropriate here since either (i) Plaintiff knew all along she had the recordings and failed to produce them until recently, supporting the inference that she could be concealing additional evidence, or (ii) she lacks the expertise to search her devices, leading to the inference that there may be more discoverable material on the devices that she does not know how to find. (Doc. 67, at 11). Plaintiff does not rebut these claims of possible concealment or lack of competence, and merely contends, through counsel, that a third possibility, which is "the actual condition," is that "her memory was sparked and she went looking for the material that she thought might be there. Finding it, she provided it." (Doc. 69, at 14).

A number of factors weigh in favor of ordering such an examination, including (i) Plaintiff's very late production of key evidence; (ii) unanswered questions about the creation of the tapes, their use throughout this case, and the reasons for their tardy production; and (iii) Plaintiff's counsel statement that *he* "has no knowledge as to the device" on which the recordings were made and cannot reveal whether Plaintiff has sufficient knowledge of any relevant devices because that could constitute a waiver of the Fifth Amendment privilege (Doc. 69, at 13). The Court is not prepared, however, to order such an examination to proceed on the current record, especially in light of the additional discovery allowed by this Order. If, after taking that discovery, Defendant determines that it still has a basis for requesting a forensic examination, the request may be renewed at that time. Accordingly, the motion is denied without prejudice.

### 6. Confirmation of Full Production

Defendant also asks that Plaintiff "confirm" that she has produced "all relevant documents (including audio and video files) in her possession, custody, or control." (Doc. 67, at 6). In light of the late production of the recordings and transcripts, and the possibility that other recordings or transcripts exist, the Court grants this request in part as follows: Plaintiff's counsel shall provide defense counsel with an affidavit that, after consultation with Plaintiff and a reasonable and good faith search, all responsive recordings and transcripts in Plaintiff's possession, custody, and control have been produced and none have been withheld by the assertion of objections, privileges, or other doctrines or rationales (assuming this is so). Defendant may also, of course, pose these and related questions to Plaintiff herself in the deposition allowed by this Order.

### 7. Plaintiff's Motion for Leave to File Surreply

Plaintiff filed a motion for leave to file a surreply (Doc. 79), which Defendant opposed (Doc. 81). It is within the Court's discretion to allow the filing of a surreply. *Meraz-Camacho v. United States*, 417 Fed. Appx. 558, 559 (7th Cir. 2011). Where a movant's reply is consistent with the reasoning put forward in its initial brief, a surreply is unnecessary. *Gerlach v. Rokita*, 2023 WL 2683132 (S.D. Ind. Mar. 29, 2023).

Defendant did not raise new arguments in its reply brief. The reply addresses points made in its opening brief, including that Plaintiff waived her Fifth Amendment rights (Doc. 67, at 8-9) and that Plaintiff's failure to remember that she had the Audio Tapes is not a credible justification for their tardy production (*id.*, at 10-11). As for the parties' debate about whether Title VII and Section 1981 protect against discrimination on the basis of citizenship, and whether Plaintiff or Mr. Wright is the more credible witness on the underlying facts of the case (see Doc. 79, at 1-2), the Court need not resolve these issues in deciding the instant motion. Plaintiff's motion for leave to file a surreply, or alternatively to strike Defendant's reply brief, is therefore unnecessary and denied.

## II. PLAINTIFF'S MOTION TO COMPEL (Doc. 57)

Plaintiff's motion to compel asks for leave to take two additional depositions and seeks relief relating to a third deposition already taken. Each is discussed in turn.

### A. Request to Depose Mohammed Al Bulooki

Plaintiff seeks to take a video deposition of Defendant's Chief Operating Officer ("COO"), Mohammed Al Bulooki. Plaintiff first argues that this deposition was "contemplated by the District Court's order of October 20, 2022 (Doc. 43)" (Doc. 42, at 4), but that is incorrect. The district judge issued that order on the heels of the JSR that the

12

parties filed on October 12, 2022 seeking an agreed extension of discovery for the purpose of taking certain specified depositions. The JSR's list of deponents included Mr. Bulooki, whose deposition Plaintiff "reserve[d] the right to take" while Defendant "reserve[d] the right to object" to the deposition, without either side making any argument. (Doc. 42 ¶ 5). The district judge allowed the extension "[b]ased upon the representations" in the JSR for the "limited purpose" of completing the depositions that the parties had identified. (Doc. 43 (minute entry)). The inclusion of Mr. Bulooki in the recital of deponents was not a ruling on the merits of whether his deposition should be allowed.

Defendant contends that the so-called "apex" doctrine protects Mr. Bulooki from a deposition in this case. (Doc. 61, at 5-6). Mr. Bulooki, who is based in the UAE, is Defendant's second highest-ranking officer at Etihad, which employs 9,000 employees and flies to 45 countries. As Defendant's COO, he is responsible for substantially all of Defendant's sales and operational activities. (Doc. 61, at 3-4). The case of *Little v. JB Pritzker for Governor*, 2020 WL 868528, at *1 (N.D. Ill. Feb. 21, 2020), describes the circumstances under which the apex doctrine protects such a high-ranking executive from being deposed, including where the executive lacks "unique personal knowledge of the matter in dispute"; where the information may be obtained from other witnesses or other discovery; *or* where sitting for a deposition would pose a hardship in light of the officer's other duties. Any one of these factors is sufficient to disallow an apex deposition. Defendant claims all are present here. (Doc. 61, at 6).

Plaintiff's justification for deposing Mr. Bulooki is that (i) she once "complained to [him] "face-to-face" about various matters; and (ii) Mr. Bulooki is quoted as saying, on Defendant's website, that "UAE nationals play a key role at Etihad Aviation Group" and

"[a]s our Emiratisation initiatives have grown progressively over the years, today we see the benefits by having more and more of our Emirati leaders across the globe and in stations serving our guests." (Doc. 57, at 5). Plaintiff also points to a quote elsewhere on the website, in a section called Emiratisation, about how Etihad is "committed to developing Emirati talent within our business." (*Id.*). Plaintiff goes on to argue, without a single record citation, that Mr. Bulooki, "would have knowledge" of the harassment and termination of Plaintiff; the duties of her supervisor (John Wright) and meaning of Emiratisation; the discrimination against Plaintiff regarding income tax policies; and his involvement in creating policies adversely affecting Plaintiff. (*Id.*).

Plaintiff argues more specifically that a "face-to-face" meeting she had with Mr. Bulooki on December 4, 2019, long before her discharge in August 2020, justifies his deposition. (Doc. 57, at 4; Doc.1 ¶¶ 83-95, 120). According to Plaintiff, the meeting occurred by "happenstance" at an airport lounge in Heathrow at which Plaintiff and Bulooki talked about an unrelated operational situation. After that conversation, Mr. Bulooki asked if Plaintiff had anything else she wanted to raise, and Plaintiff said she was "uncomfortable with John [Wright]" and felt he was "attacking me" and "the bulk of it was about me just feeling really uncomfortable with John and his working style" and "he continues to talk about Emiratisation," to which Mr. Bulooki allegedly responded "John was having family problems and he was possibly taking it out on [Plaintiff]." (Doc. 61-1, at 227:10-228:9; 235:12-14). In interrogatory responses, Plaintiff did not identify this

meeting as the making of a complaint to Defendant about her grievances. (Doc. 61-1, at 38-41).[4]

This alleged conversation does not demonstrate that Mr. Bulooki has any unique personal knowledge about this case. Indeed, it is clear from Plaintiff's own testimony that Mr. Bulooki was guessing what Mr. Wright's "possibl[e]" motivations might be. Nor does Plaintiff's recitation of the conversation suggest that she told Mr. Bulooki any of the details such that he could be in any position to weigh the facts, much less that he was involved in or had any knowledge of any alleged harassment or discrimination or personally engaged in decision-making regarding her employment. These facts are far less compelling than the facts in *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 681-2 (7th Cir. 2002), where the Seventh Circuit affirmed the trial court's refusal, in a Title VIII case, to compel a deposition of a corporate vice president (a position far below that of company-wide COO). There, the vice president had "a few people coming to me about [plaintiff's] plight" and asked the HR director to take a "second look" at the issues, clearly indicating that the details of the termination decision at issue were discussed with him and that the executive wanted the HR director to take some action. *Id.* at 679. The Court rejected plaintiff's argument that these facts showed that the witness had information relevant to her termination and found that the burden of deposing such a senior executive coupled with better sources of relevant information supported affirming denial of the motion to compel. *Id.* at 681-2. Unlike in *Patterson*, here the alleged discharge had not yet occurred and there is no indication that Mr. Bulooki became personally involved in the

---

[4]    According to Defendant, Mr. Bulooki denies ever having had the conversation described by Plaintiff, and the parties tried to agree to a stipulation to that effect to obviate deposing Mr. Bulooki. (Doc. 61 at 7; Doc. 61-1 at 15-18 (draft stipulation)). Plaintiff rejected the stipulation. (Doc. 65, at 4).

details or handling of Plaintiff's employment situation or complaints.  See also *Lee v. City of Chicago*, 2021 WL 2399999, at *4 (N.D. Ill. June 11, 2021) (without unique personal knowledge, fact that senior official was made aware of plaintiff's allegations, viewed a video, and supported an investigation does not justify deposing the official).

In reply, Plaintiff tries to recast the "unique information" test, claiming that Mr. Bulooki has "unique information" about the alleged conversation at Heathrow. (Doc. 76, at 5).  But the issue is not whether Mr. Bulooki has some unique information about some fact, but whether he has unique information about the matter in dispute.  Plaintiff has not met this test.

Plaintiff turns the apex doctrine on its head with her next argument, claiming that only Mr. Bulooki is "high enough" in an organization with 9,000 employees to address "other issues" and asking, "who could possibly know more" about the company's policies than its COO?  (Doc. 65, at 5).  But the rationale behind the apex doctrine is that senior executives delegate tasks, and their knowledge of and involvement in granular issues is limited or non-existent and, in any event, not firsthand.  Plaintiff's argument flunks the "unique knowledge" test.  See *Little v. JB Pritzker for Governor*, 2020 WL 868528, at *2 (Mr. Pritzker had no unique personal knowledge of employment issues on a campaign that employed only 200 people).

Plaintiff's only other hook for deposing Mr. Bulooki is his high-level statement about Emiratisation on Defendant's website.  But plaintiff provides no evidence that, in a company as large as Etihad, Defendant's COO is the only person in the company that can testify about that term.  As just one example, Defendant's Rule 26(a)(1) disclosures reveal several witnesses on this topic (Doc. 61-1 at 109-111 (item I, numbers 2, 3, 4, 6,

7, 8)), and even Plaintiff concedes that other deponents may have at least some of the information she seeks (Doc. 65 at 5 & n.5). Clearly Mr. Bulooki is not the only source of information on this issue.

This analysis alone justifies denial of the motion to compel Mr. Bulooki's deposition, obviating a discussion of the remaining apex factors. Plaintiff had numerous discovery devices at her disposal to pinpoint sources of information on various discovery topics. The apex doctrine requires litigants to use those devices to obtain the information they need, which includes developing and identifying reasons, where legitimate, to depose senior executives. Plaintiff has not sustained the burden of proof on her motion to compel Mr. Bulooki's deposition.

## B.     Request to Depose Attorney Martin Dajani

Martin Dajani is one of Defendant's in-house attorneys. Counsel for Plaintiff in this case, Aaron Maduff, had a phone call and exchanged letters with Mr. Dajani in the lead-up to Plaintiff's discharge. Plaintiff (but not Defendant) listed Mr. Dajani in her initial disclosures in this case, and she now seeks to depose him. In support, she argues that he is "the person best able to testify with respect to what actions Etihad took when Plaintiff made the complaints of discrimination," including who knew of those complaints. According to Plaintiff, Mr. Dajani can testify about what he told company witnesses about what Mr. Maduff told him about Plaintiff's grievances and what the witnesses did in response.

Clearly such a wide-ranging deposition of an opponent's legal counsel would touch on innumerable facts and topics protected by the attorney-client privilege and the work product doctrine. Because of the potential for abuse in deposing an opponent's legal

counsel, a party seeking such a deposition must, at a minimum, make a "strong showing of need" for the deposition and demonstrate that "all other discovery avenues have been exhausted." *Howard v. Securitas Sec. Services, USA, Inc.*, 630 F. Supp. 2d 905, 911 (N.D. Ill. 2009).[5] The threshold issue in such an inquiry is why the party should be allowed to seek information directly from an opponent's counsel, versus from other sources. *Id.* (denying deposition of counsel where no such showing was made).

Here, Plaintiff does not even attempt to make that showing. As in *Howard*, she has "not set forth any evidence that [she] has no other way to access this information," including through interrogatories, documents, other depositions, and the like. *Id.* For example, Defendant points out that Plaintiff asked Mr. Wright in his deposition whether he was made aware of the letters between counsel (he was). (See Doc. 61, at 12). Despite her conclusory argument that the letters and a phone call between Messrs. Dajani and Maduff (Doc. 57-3) are relevant to the case, Plaintiff never describes what is in the letters or the phone conversation that she wants to ask about, much less how it is relevant; what discovery she took of non-legal witnesses on these topics; and why she should now be able to delve into communications between counsel and client. Plaintiff goes so far as to say that Mr. Dajani is a "fact witness" (Doc. 57, at 8), without ever identifying the facts to which Mr. Dajani is supposedly a witness. A review of the letters themselves strongly suggests the opposite: Mr. Dajani is clearly acting as counsel in these letters, and Plaintiff acknowledges that his written communications with his clients in which

---

[5]     *Howard* noted that some courts in the Seventh Circuit require the much stricter showing that no other means exist for obtaining the information and the information is crucial to the case and non-privileged. 630 F. Supp. 2d at 910-911. The court need not choose between these two tests, since Plaintiff's motion fails under both of them.

information about the case is conveyed are privileged.  (See Doc. 57, at 7 (Plaintiff's brief conceding that *client's* communications with counsel are privileged)).

Instead of explaining what she hopes to achieve by this deposition, Plaintiff resorts to claiming that the deposition should proceed and *then* the parties can determine what questions should be allowed based on the questions asked and the objections made. (Doc. 57 at 8; Doc. 65, at 6-7).  She claims that if Mr. Dajani has a legitimate privilege objection to a question, "at least at that point, Plaintiff will have the information necessary to identify another deponent if necessary."  (Doc. 65, at 7).  But Plaintiff has it exactly backwards.  The threshold requirement in *Howard* requires that Plaintiff explain why she should be allowed to seek information directly from Defendant's counsel versus from other sources.  Because Plaintiff has not met this threshold test, the Court need not decide the extent to which Plaintiff's proposed deposition would invade the attorney-client privilege and work product doctrine or whether the attorney communications at issue constitute protected settlement communications under Federal Rule of Evidence 408.

### C. Request for Relief Stemming from Conduct during Deposition of Anoud Eisa

Plaintiff claims that after a break in the deposition of Ms. Eisa—which was after the close of Plaintiff's questioning (Doc. 61, at 13; Doc. 61-1, at 240:13-19)—Defendant's counsel said "let's go talk" to the witness.  After the break, which was the start of Defendant's direct exam of Ms. Eisa (Doc. 61-1, at 240:20-22), Plaintiff says that "[d]efense counsel had the witness contradict her most immediate testimony."  (Doc. 57, at 9).  When Plaintiff's counsel asked the witness "what did you talk about with Mr. Dajani and Mr. Brenneman when you left the room," she was instructed not to answer based on

attorney-client privilege. (See Doc. 61-1, at 242:17-243:16.). Plaintiff argues that it would have been improper for Ms. Eisa to talk to counsel during the break. (Doc. 57, at 9-10).

One of the problems with this motion is that Plaintiff nowhere explains what relief she is seeking. In the summary to the overall motion, Plaintiff says that "Absent an understanding of where [the witness] obtained the contrary information and why she countered her prior testimony, she should be barred from providing it." (Doc. 57, at 11). But to the extent that Plaintiff is seeking an order barring Ms. Eisa from giving certain testimony in this case, it is not only premature, but it is not properly before this Court. The Court's referral here was for "discovery supervision and to facilitate a resolution of the parties' dispute over tapes and transcripts." (Doc. 83). Making trial rulings on the admissibility of evidence does not fall within that referral. And in any event, none of the cases Plaintiff cites for the proposition that the evidence should be excluded (Doc. 57, at 9-10) supports the relief she seeks; none involved counsel's direct examination of his own witness after the close of adversary questioning. See, for example, *Plaisted v. Geisinger Medical Center*, 210 F.R.D 527, 535 (M.D. Penn. 2002), on which Plaintiff relies (Doc. 57, at 9), which concerned an attorney-client consultation *while an adversary question was pending*, which was not the situation here.

In any event, the entire premise behind Plaintiff's motion is flawed as it relies on the claim that Ms. Eisa contradicted her testimony after Plaintiff's counsel completed her questioning. Yet not only does Plaintiff fail to provide citations and copies of the deposition pages for the allegedly inconsistent pre-break testimony, she never explains how that pre-break testimony was later contradicted. (See Doc. 57-1, revealing only the post-break testimony). Nor does she discuss the fact that the post-break testimony was

elicited by defense counsel after the end of Plaintiff's questioning, much less the rules applicable to an attorney's questioning of his own witness.

Each of these defects alone would require denial of the motion to compel on this point. But in addition, Defendant's response demonstrated that Ms. Eisa did not contradict her testimony after the break. Before the break Ms. Eisa was asked to explain what AOAM means (Airport Operational Assistant Manager). At that point, Plaintiff's counsel ended her questioning. (Doc. 61-1, at 239:20-240:13). Defense counsel asked for a break and said, "let's go talk real quick." After the break, he asked the witness to describe the AOAM position and its purpose and state whether any AOAM ever took the position of a regular airport employee. (Doc. 61-1, at 240:15-242:9). There appears to be no contradiction in the pre- and post-break testimony.

In reply, Plaintiff does not respond to this evidence that Ms. Eisa did not contradict herself, stating only that the "parties disagree on this point" without identifying the supposed disagreement. (Doc. 65, at 7-8). Plaintiff then changes the relief she seeks, asking for discovery "of the coaching apparently had with Ms. Eisa." (Doc. 65, at 8). Plaintiff provided the court with no authority for such relief under these circumstances, and this relief is also denied.

### D. Plaintiff's Supplement to Her Motion to Compel

On May 23, 2023, Plaintiff filed a supplement to her motion to compel containing a transcript of an alleged conversation between Plaintiff and Mr. Wright that she belatedly produced to Defendant on April 28, 2023. (Doc. 71). In that supplement, she argues that the transcript is relevant to the motion but was "not available for use in this case" when she "filed" the motion. (Doc. 71, at 1-2). Plaintiff did not seek, and was not granted, leave

to file the unauthorized supplement. Had she sought leave, Plaintiff would have needed to explain what prevented her from including and discussing the transcript in her motion (Doc. 57) to which Defendant responded (Doc. 61), and Plaintiff then replied (Doc. 65). Mere inclusion of the ambiguous statement that the transcript was "not available for use in this case" would not suffice without explaining *why* it was not available. Because the supplement was improperly filed, the Court did not consider it (or Defendant's response, Doc. 82) in its ruling. The Court notes, however, that the content of the supplement did not demonstrate that Mr. Bulooki had unique knowledge about Plaintiff's case or contribute in any way to Plaintiff's effort to depose Mr. Dajani.

## CONCLUSION

For the reasons stated herein, Plaintiff's motion to compel (Doc. 57) is denied in its entirety and Defendant's motion to compel (Doc. 67) is granted in part and denied in part on the terms described in this order. Plaintiff shall respond to the Defendant's Supplemental Discovery, produce Audio Tapes in native format and showing all associated metadata, and submit Plaintiff's counsel's affidavit by September 26, 2023. Plaintiff shall then appear for a four-hour deposition within 30 days of the production of the above discovery.

ENTER:

Dated: September 12, 2023

*Sheila Finnegan*

SHEILA FINNEGAN
United States Magistrate Judge